IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CYNTHIA A. FOGLIO,                          )
                                            )
          Plaintiff,                        )
                                            )      No. 12 C 5270
v.                                          )
                                            )      Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting                   )
Commissioner of Social Security,[1]         )
                                            )
          Defendant.                        )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Cynthia Foglio seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 21). The Commissioner has responded seeking affirmance of the decision denying benefits (doc. # 29). For the following reasons, we deny Ms. Foglio's motion (doc. # 21), and affirm the Commissioner's decision.

I.

We begin with the procedural history of this case. Ms. Foglio filed for SSI on April 9, 2009, and DIB on April 20, 2009, alleging that she became unable to work on November 20, 2006 due to her disabilities (R. 16). Her applications were denied initially and upon reconsideration. Ms. Foglio then filed a written request for a hearing, and amended her onset date to March 30, 2009 (Id.). On April 26, 2011, the Administrative Law Judge ("ALJ") issued

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin as the named defendant.

[2] On December 5, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 11).

an opinion denying benefits (R. 16-28). The Appeals Council denied Ms. Foglio's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

In our review of the administrative record, we describe Ms. Foglio's general background in Part A, followed by the medical record in Part B. In Part C, we review the hearing testimony, and in Part D, we review the ALJ's opinion.

## A.

Ms. Foglio was born February 20, 1960 (R. 39). She lives with her boyfriend, and has three adult children, who do not live with her (R. 297). She is 5'1" and weighed 190 pounds at the date of the hearing (R. 39-40). At that time, she was taking Percocet daily (R. 40). She is not supposed to drive while taking certain pain medication, but she drives when necessary (R. 41). She testified that she got into a car accident in April 2010 because she had blacked out or had a seizure (*Id.*).

Ms. Foglio is a high school graduate; she most recently worked at Radio Shack, managing the store, from 2005 to 2009 (R. 41-42). She worked full time until March 31, 2009, then went part time – working 15 to 20 hours a week – until she stopped working in September 2009 (R. 42). She testified that during that time, she did not lift more than 10 pounds because she often dropped things (R. 44), and she could only work for two to three hours a day before she had to return home to sleep (R. 58).

In disability forms Ms. Foglio completed, she listed her daily activities and reported that on bad days she sits most of the day and limits her movements to avoid pain as much as possible (R. 217-34, 272-83). On good days, she tries to do some light housework, but she can only do a

little at a time, and must take frequent rest breaks (R. 275, 224). Though she used to cook full meals, she now is limited to preparing simple things like sandwiches and microwavable meals (R. 222, 277). She can no longer perform her hobbies of gardening, hiking, crocheting, sewing, or dancing (R. 228, 234). She still likes to watch live music, but she has a difficult time staying awake (*Id.*). She does not leave the house regularly; she sometimes goes grocery shopping, but she limits those trips to buying only a few items at a time (*Id.*). Ms. Foglio has difficulty bathing and washing her hair because of weakness and aching in her arms (R. 222). She used to care for her grandchildren three or four nights a week, but due to exhaustion, she now cares for them only once or twice a month (R. 222, 234). She stated that she has difficulty climbing stairs, squatting, reaching, bending, and concentrating for long periods of time (R. 229).

**B.**

The medical record begins with hospital records from March 31, 2009, when Ms. Foglio was brought to the emergency room for a possible seizure (R. 295).[3] She reported that she had taken approximately 100 Tramadol pills over two days because she had severe fibromyalgia pain all over her body (R. 295-96). The treating doctor opined that this overdose caused the seizure, as Ms. Foglio had no history of seizures, and both her EEG and neurological exam were normal (R. 295-296, 299). Rather than prescribe antiepileptic drugs, the doctor ordered a psychiatric consultation to evaluate her suicide risk, but Ms. Foglio told the doctor that she was not attempting suicide (R. 296-98). Her mental status examination was normal, and the doctor recommended outpatient counseling to address the stress she was under at work (R. 298).

Ms. Foglio began seeing internist Sanjay Pethkar, M.D., on April 3, 2009. He recorded that she had fibromyalgia, seizures, hypertension, and was "totally disabled" and should not

---

[3]The ALJ noted that although Ms. Foglio originally alleged disability as of November 2006, the record contains no medical evidence until March 2009, and Ms. Foglio continued to work full-time until then (R. 24).

work or drive (R. 317-18, 399). At her next visit, on June 1, 2009, Dr. Pethkar listed that Ms. Foglio had multiple joint aches and pain, motor disturbances, bilateral arm and leg weakness, hip pain, anxiety, depression, sleep disturbances, and lacked energy (R. 397). She was taking Morphine and Norco for pain and Lopressor for hypertension (*Id.*). Dr. Pethkar recorded that his touch and pin prick examination showed Ms. Foglio had decreased sensation in her legs but all other examinations results were normal (*Id.*). He diagnosed Ms. Foglio with chronic fatigue syndrome, possible fibromyalgia with myositis (swelling), chronic pain syndrome, and seizures, and wrote that "due to seizures should avoid working and apply for disability" (R. 398). At Ms. Foglio's next visit on July 2, 2009, Dr. Pethkar listed the same symptoms and diagnoses, but took Ms. Foglio off Norco and prescribed extra Morphine for breakthrough pain (R. 395-96).

On June 2, 2009, in response to a request from the Social Security Administration ("SSA"), rheumatologist Lori Siegel wrote a letter describing medical evidence she had for Ms. Foglio from January 1, 2008 to the present (R. 332-34). Ms. Foglio testified that Dr. Siegel treated her fibromyalgia from 2003 to 2009 (R. 59), but the letter is the only evidence from Dr. Siegel in the record, and it states that July 2, 2008 was the only time Ms. Foglio saw Dr. Siegel after January 1, 2008 (R. 333). In the letter, Dr. Siegel did not state that she had reviewed any medical records concerning Ms. Foglio after July 2, 2008. Nonetheless, Dr. Siegel opined that Ms. Foglio had severe fibromyalgia, a seizure disorder, and chronic pain, and took Tramadol and Norco for pain, and Elavil for depression (*Id.*). Dr. Siegel opined that Ms. Foglio could not sit or stand for longer than ten minutes at a time, needed frequent rest periods during the day, had decreased strength and movement in her upper extremities, and could not lift or carry more than five pounds (*Id.*). Dr. Siegel wrote that the pain also affected Ms. Foglio's ability to concentrate and made it difficult for her to work reliably (*Id.*).

On July 13, 2009, a state agency doctor, Dr. Richard Bilinsky, reviewed Ms. Foglio's medical record and completed an initial determination denying Ms. Foglio's claims of disability due to fibromyalgia, seizure disorder, and chronic fatigue syndrome (R. 336). He reasoned that Ms. Foglio had little to no treatment history; the medical evidence from Dr. Siegel was not current or supported by more recent medical evidence; Dr. Pethkar's June 2009 physical examination was within normal limits; and Dr. Pethkar's April 2009 opinion that Ms. Foglio was totally disabled was an opinion reserved for the Commissioner (R. 338).

On September 11, 2009, Ms. Foglio visited Dr. Pethkar again (R. 393-94). Dr. Pethkar listed similar symptoms and diagnoses as in July 2009, but he also recommended a neurology consultation with Dr. Nitin Nadkarni (R. 394). For two weeks before her appointment with Dr. Nadkarni, Ms. Foglio recorded having 20 spasms in various parts of her body (R. 340). On September 30, 2009, after performing an MRI on Ms. Foglio's brain, Dr. Nadkarni diagnosed her with myoclonus (R. 339).[4] Dr. Nadkarni recommended a 24-hour EEG, but Ms. Foglio stated that she would wait for this test because she lacked insurance (R. 341, 391).

Dr. Pethkar's notes from Ms. Foglio's visits on October 8, 2009, November 5, 2009, December 3, 2009, and January 4, 2010, listed similar symptoms and diagnoses as in September 2009, and recorded that the results of all of Ms. Foglio's physical examinations were normal (R. 387-92). Dr. Pethkar prescribed Morphine for pain, and in December 2009, he also prescribed Lexapro for anxiety and adjustment disorder, although he noted that Ms. Foglio had no anxiety or sleep disturbances, and her depression was controlled with medication (R. 385-88).

On January 25, 2010, clinical psychologist Erwin Baukus, Ph.D., evaluated Ms. Foglio at the request of Disability Determination Services ("DDS"). Ms. Foglio reported various

---

[4]Myoclonus is sudden, brief involuntary movements or muscle jerks, which may occasionally be a sign of a neurological condition. http://www.mayoclinic.org/myoclonus/.

depressive symptoms such as: sleep disturbance, decreased energy, difficulty concentrating and thinking, thoughts of suicide, loss of interest in activities, and a weight gain of 30 pounds since March 2009 (R. 345). She reported being able to independently, but slowly, tend to her activities of daily living ("ADLs"), including personal hygiene, walking or driving, doing chores around the home, and grocery shopping (R. 346). She felt that she got along and communicated well with family and friends (*Id.*). Dr. Baukus observed that her mood was mildly depressed, her affect was stable (with a variable range), she was alert, and her speech was coherent and logical (*Id.*). In addition, Ms. Foglio's orientation, judgment, abstract thinking, and ability to do simple calculations were normal (R. 347). In a test of her immediate memory, she could repeat 7 digits forward and 5 digits backward, but she was unable to repeat 8 digits forward or 6 digits backward (*Id.*). Dr. Baukus diagnosed her with chronic pain disorder associated with both psychological factors (depression) and a general medical condition (*Id.*).

On February 11, 2010, state agency consulting psychiatrist, Dr. Elizabeth Kuester, reviewed the medical record and completed a mental residual functional capacity ("RFC") assessment for Ms. Foglio (R. 361). Dr. Kuester agreed with Dr. Baukus's diagnoses, but found that Ms. Foglio did not meet a listing (R. 355). She found that plaintiff had mild restrictions in ADLs, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, and pace, with no episodes of decompensation (R. 359). Further, Dr. Kuester found moderate limitations in Ms. Foglio's ability to understand, remember, and carry out detailed instructions (R. 363-64). Dr. Kuester concluded that Ms. Foglio's allegations of disabling mental symptoms were not supported by her history of minimal treatment, the mild to sometimes moderate mental limitations evidenced in the medical record, and her ADLs (R. 361). Nevertheless, Ms. Foglio's "intermittent, variable, and overall moderate dysphoria and

preoccupation with symptoms," would create "some difficulty" in sustaining the levels of concentration required for complex tasks (R. 365). Therefore, Dr. Kuester opined that Ms. Foglio should be limited to learning and performing simple, routine tasks with ordinary instruction and supervision (*Id.*).

At Ms. Foglio's next appointment with Dr. Pethkar, on February 15, 2010, he listed her symptoms as motor disturbances, bilateral arm and leg weakness, low back and hip pain, tingling and numbness in the legs, anxiety, and sleep disturbances; and he listed her diagnoses as chronic pain syndrome, chronic fatigue, and possible fibromyalgia with swelling (R. 383-84). His touch and pin prick examination showed decreased sensation in Ms. Foglio's legs, but other examinations were normal (*Id.*).

On March 8, 2010, state agency medical consultant, Dr. George Andrews, completed a physical RFC assessment for Ms. Foglio based his review of the medical evidence (R. 367-68). He opined that she could perform the full range of medium work (R. 368-71). Dr. Andrews explained that he disagreed with Dr. Pethkar's and Dr. Siegel's opinions because the evidence did not support their conclusions (R. 373). Further, he found Ms. Foglio's complaints were only partially credible because while she had a diagnosis of fibromyalgia and chronic fatigue syndrome, the severity of her complaints was not supported by the medical evidence (R. 374).

From March through October 2010, Dr. Pethkar listed Ms. Foglio's diagnoses as seizures, chronic fatigue, and fibromyalgia pain, and his examinations showed tingling and decreased sensation in her legs (R. 375-82). She took Morphine and sometimes Norco for her pain, but in May 2010, Dr. Pethkar switched her to Percocet for her pain, and Ms. Foglio began taking Savella to relieve her aches and pain from fibromyalgia (R. 375-77). Dr. Pethkar also recorded that Ms. Foglio had anxiety, depression, and sleep disturbances, and in April 2010, he added a

prescription for Xanax (R. 375-82). On April 15, 2010, Dr. Pethkar wrote that Ms. Foglio's hypertension was uncontrolled due to stress (R. 380), but on April 21, 2010, her hypertension was stable on Lopressor and Dyazide (R. 377). In May 2010, Dr. Pethkar added a prescription for Amitriptyline (for depression) (R. 375-76).

In June 2010, Dr. Pethkar performed a fibromyalgia screening, which was "remarkable for her multiple tender points" and thus indicated a "significant diagnosis of fibromyalgia" (R. 413). Dr. Pethkar's notes from July 2010 also recorded neurological issues, specifically motor disturbances, bilateral arm and leg weakness, and pain in her hips (R. 414). That month, Ms. Foglio expressed concern that she had gained weight over the previous seven years (R. 415).

On October 25, 2010, at the request of DDS, Dr. Sheldon Slodki reviewed the medical record and gave an opinion on Ms. Foglio's physical RFC that agreed with Dr. Andrews' opinion that Ms. Foglio could perform the full range of medium work and that none of Ms. Foglio's impairments met or equaled a listing (R. 402-09). Specifically, Dr. Slodki found that Ms. Foglio did not meet the frequency criteria for a seizure disorder; her fibromyalgia diagnosis was not supported because there was no evidence of "mapping of the tender points;" and her hypertension was under control (R. 411).

Ms. Foglio continued to have regular appointments with Dr. Pethkar from August 2010 through April 2011. Dr. Pethkar's notes from these visits list the familiar diagnoses of fibromyalgia, chronic pain syndrome, and anxiety and/or depression (R. 422-36). His notes also list her symptoms as low back pain, tingling and numbness in her legs, fatigue, and sleep disturbances (R. 422-36). On November 1, 2010, Dr. Pethkar recommended that Ms. Foglio follow up with a pain clinic (R. 423), but there is no evidence that this follow up occurred. On November 23, 2010, Dr. Pethkar recorded that Ms. Foglio had been suffering from anxiety and

depression, but her anxiety was well-controlled with Xanax (R. 424). To cope with her pain, Ms. Foglio took medication most days, but she suffered no negative side effects or feelings of withdrawal (*Id.*). Her hypertension was also well-controlled with medication (*Id.*).

On January 17, 2011, Dr. Pethkar added "diffuse pain syndrome" to the list of diagnoses, and noted that Ms. Foglio was taking Savella for her fibromyalgia pain (R. 428). In addition, he prescribed Ms. Foglio with Synthroid (for hypothyroidism) and Amitriptyline (*Id.*). In February and March 2011, he also prescribed Percocet for her fibromyalgia (R. 430, 434), and in April 2011, he prescribed Norco (R. 435).

## C.

On March 16, 2011, Ms. Foglio (represented by counsel) and a vocational expert ("VE") testified during an hour-long hearing before the ALJ. Ms. Foglio testified that her pain was so bad that she could not stand or sit for more than 10 to 20 minutes before she had to switch positions (R. 50-51). She has trouble sleeping due to the pain; even with medication, she usually sleeps only one to two hours at a time (R. 52). The pain is everywhere except her face; she rates the pain from a 9 to 12 on a 10 point scale (R. 53). The pain gets worse when her stress level increases and when the temperatures turn colder (R. 53, 62).

Ms. Foglio has only had one documented seizure, but she may have blacked out once behind the wheel of her car in April 2010 (R. 55). She testified that she has myoclonus (involuntary jerking or spasms) in her hands, feet, and other body parts, and weakness and numbness in her hands and feet (R. 60). This causes her to drop things, so she avoids lifting more than a gallon of milk (R. 51, 54, 56, 60-61). She also wears Velcro shoes because she cannot tie her laces, and she tries to avoid driving (R. 61).

On a typical day, she gets up, takes her medications (Percocet, Xanax, Elavil, Synthroid, and Lopressor), and sits down to watch television (R. 54-56). The only side effect she has is sleepiness and dry mouth (R. 55). On "good days," she can rinse dishes and load the dishwasher a little at a time, do crafts for brief periods of time, do small handfuls of laundry, and prepare herself a sandwich, soup, or microwave meal (R. 56-58). She takes two to three naps per day because the pain wears her out (R. 62). She is depressed because she cannot do things she used to enjoy, such as playing with her grandchildren, crocheting, and cooking; she takes Amitriptyline to help with her depression (R. 63). She also gets anxious when something happens to her grandchildren and she cannot help them (*Id.*).

The VE testified next. He described Ms. Foglio's past work as an administrative assistant (sedentary and skilled), a customer service clerk (light and semi-skilled), a retail store manager (light and skilled), and a laborer (medium and unskilled) (R. 67-69). The ALJ asked the VE to consider a claimant of Ms. Foglio's age, education level, and work experience who could do medium work, with no exposure to heights or hazards, and no concentrated exposure to temperature extremes (R. 69). The VE testified that such a claimant could perform all of Ms. Foglio's past work (*Id.*). The hypothetical was then limited to light work, with simple instructions and routine tasks (*Id.*). The VE found that none of Ms. Foglio's past work would meet those limitations; however she could work as a mail clerk, fast food worker, or office helper (R. 69-70). The ALJ's next hypothetical added a sit/stand option allowing the claimant to change positions every 30 minutes for five minutes at a time while remaining on task (R. 70). The VE stated that this would decrease the available mail clerk positions from 5,000 to 3,000, eliminate the fast food worker position, and erode the number of office worker positions from 10,000 to approximately 5,000 positions (*Id.*). Adding a limitation to frequent but not constant

bilateral handling and fingering would eliminate all the aforementioned jobs, but the claimant could work as a telephone quotation clerk, surveillance system monitor, or ticket seller (R. 70-71). The VE further testified that no jobs would be available to a claimant who needed to take a one-hour nap per day outside of the normal break time, who was off task 30 percent of the time, or who needed to miss two days of work per month (R. 71).

### D.

On April 26, 2011 the ALJ issued a written opinion finding Ms. Foglio was not disabled (R. 16-28). She applied the standard five-step inquiry for determining disability, which required her to analyze whether Ms. Foglio (1) had not engaged in substantial gainful activity during the period since the alleged onset date; (2) had a severe impairment or combination of impairments; (3) had an impairment that met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) could perform her past relevant work; and, if not, nonetheless (5) was capable of performing any other work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found that Ms. Foglio had not engaged in substantial gainful employment since March 30, 2009, her amended onset date (R. 18). At Step 2, the ALJ concluded that Ms. Foglio had the following severe impairments: fibromyalgia, chronic fatigue, and obesity (*Id.*). The ALJ found that Ms. Foglio's alleged seizure disorder was not severe because she had only one recorded seizure due to an overdose of Tramadol, her EEG was normal, and she continued to drive, at least until April 2010 (R. 18-19).

The ALJ also assessed Ms. Foglio's mental impairments -- chronic pain disorder and anxiety -- using the four broad functional areas known as the Paragraph B criteria. The ALJ determined that those impairments did not cause more than minimal limitations in her ability to

perform mental work activities, and were therefore non-severe (R. 19). The ALJ found that Ms. Foglio had mild limitations in ADLs; though she complained of difficulties in completing daily activities, those difficulties were based on her physical ailments, not mental impairments (*Id.*). Additionally, she drove occasionally, grocery shopped, performed light house cleaning, did the dishes and laundry, and prepared her own meals (*Id.*). The ALJ reasoned that Ms. Foglio also had only mild limitations in social functioning because she visited with friends, socialized with her daughters, and kept up with friends and family (R. 19).

The ALJ also concluded that Ms. Foglio had mild limitations in maintaining concentration, persistence, or pace (R. 19). The ALJ reasoned that the evidence did not support Dr. Kuester's conclusion that plaintiff had moderate difficulties in this area because: (1) while Ms. Foglio alleged that her medications made it difficult to concentrate, she did not complain of side effects from the medication to her doctor; (2) Ms. Foglio testified clearly and coherently at the hearing, and she filled out two separate function reports in a detailed and responsive manner; and (3) Dr. Baukus's examination showed that Ms. Foglio did not have difficulty with serial sevens testing or basic calculations, and she had intact memory and adequate abstract thinking (R. 19-20). Furthermore, the ALJ explained that later submitted evidence showed Ms. Foglio's anxiety was stable on medications, and she had no abnormal mental health findings (R. 20, 24). Ms. Foglio had not experienced any episodes of decompensation of extended duration (R. 20).

At Step 3, the ALJ found that Ms. Foglio did not have any impairment or combination of impairments that met or medically equaled a listed impairment (R. 20). Nevertheless, the ALJ stated that she considered Ms. Foglio's fibromyalgia, chronic fatigue, and obesity when constructing the RFC (*Id.*). The ALJ found Ms. Foglio had an RFC to perform light work, except that she:

is limited to work that does not involve concentrated exposure to extreme heat, extreme cold or humidity. She is limited to work that does not involve concentrated exposure to heights or hazards. The claimant can perform work that allows her to alternate between sitting and standing every thirty minutes for five minutes at a time, and work that involves only simple instructions and routine tasks.

(R. 21). The ALJ analyzed the evidence that led her to determine that RFC.

The ALJ summarized Ms. Foglio's testimony, including her statements that she is at a pain level of nine out of ten most days, her skin hurts when touched, she has jerking-like muscle spasms, she cannot lift more than a gallon of milk, she has difficulty sitting or standing more than ten to twenty minutes, she drops things due to numbness in her hands and legs, and her pain medication causes dry mouth, sweating, and fatigue (R. 21-22). The ALJ did not find Ms. Foglio's self-assessment credible for several reasons: (1) Dr. Pethkar's notes did not include any complaints of significant problems with Ms. Foglio's hands, muscle spasms, or side effects from her medications (R. 24); (2) despite her complaints of daily numbness, Ms. Foglio completed two detailed function reports, one typed and one handwritten (R. 26); (3) Dr. Pethkar's exams were "generally normal except for occasionally decreased sensation in claimant's legs;" (4) Ms. Foglio's medication helped her fibromyalgia and anxiety (*Id.*); (5) she continued to work at substantial gainful activity levels until March 2009 despite a diagnosis of fibromyalgia years earlier, and she worked part-time until September 2009 (*Id.*); and (6) Ms. Foglio held herself out as being able to work from September 2009 to September 2010 in order to collect unemployment insurance (*Id.*).

The ALJ also reviewed Dr. Pethkar's treatment notes, and provided several reasons for not giving great or controlling weight to his opinion that Ms. Foglio was disabled due to fibromyalgia and seizure disorder (R. 25). *First*, the ALJ gave "no weight" to Dr. Pethkar's opinion that she was disabled and could not work, because those determinations are reserved for

the Commissioner (R. 24). *Second*, the ALJ found Dr. Pethkar's opinion that Ms. Foglio was disabled due to seizures -- offered the first time Dr. Pethkar met Ms. Foglio in April 2009 and as late as August 2010 -- was "absurd" because Ms. Foglio had only had one seizure, due to excessive medication intake, and she was never placed on anti-epileptic drugs or monitored for seizures (*Id.*). *Third*, the ALJ found that Dr. Pethkar's opinion concerning seizures was "so unsupported that it further called into question his opinion that the claimant should not work due to her fibromyalgia" (R. 24). *Fourth*, the ALJ explained that Dr. Pethkar's opinions as to Ms. Foglio's fibromyalgia were not supported by his own treatment notes. Despite recording Ms. Foglio's continued complaints of aches and pains, the only documented abnormal physical findings in Dr. Pethkar's treatment notes were decreased sensation in the legs for touch and pinprick and, at one examination, multiple tender points (R. 23-24). *Fifth*, the ALJ reasoned that Dr. Pethkar's opinion was not supported by Ms. Foglio's work history because she maintained substantial gainful activity until March 2009 (R. 24).

The ALJ also reviewed the opinion of rheumatologist, Dr. Siegel, but accorded her opinion "little weight" (R. 22, 25). The ALJ explained that Dr. Siegel's opinion was inconsistent with Ms. Foglio's work activity, which continued until well after the date Dr. Siegel last examined her in July 2008 (R. 25). In addition, because Dr. Siegel had not examined the claimant since the alleged onset date in March 2009, she had "no basis for her subsequent opinion" (*Id.*).

The ALJ next assessed the opinions of the non-examining state agency medical consultants. The ALJ did not assign great weight to Dr. Bilinsky's July 2009 opinion that Ms. Foglio did not have a severe impairment, because additional evidence was later submitted indicating that certain of Ms. Foglio's impairments were severe (R. 25). The ALJ gave "some

14

weight" to Dr. Andrews's and Dr. Slodki's 2010 opinions that Ms. Foglio had an RFC for the full range of medium work, and noted that the state agency doctors' opinions "highlight the lack of persuasive medical evidence in this case" to support Ms. Foglio's alleged level of limitation (R. 25).

That said, the ALJ disagreed with Dr. Slodki's opinion that a diagnosis of fibromyalgia was not supported, and found that the evidence supported additional limitations in Ms. Foglio's RFC than those recommended by the state agency doctors (R. 25 and n.1). The ALJ limited Ms. Foglio to light work with alternate sitting and standing positions (R. 23-24). In addition, the ALJ stated that she gave Ms. Foglio "the benefit of the doubt in regards to her allegations of dizziness and fatigue, as well as her non-severe seizure disorder," by "limit[ing] her] to work that does not involve concentrated exposure to dangerous machinery or heights, and work that involves only simple instructions and routine tasks" (R. 24). The ALJ also limited the RFC to work not involving exposure to extreme heat, cold or humidity because Ms. Foglio complained that extreme temperatures and humidity aggravate her fibromyalgia pain (*Id.*).

While Ms. Foglio could not return to her past relevant work with this RFC, the ALJ found there were a significant number of jobs in the regional economy which she could perform, including mail clerk and office helper (R. 26-27). Thus, the ALJ denied Ms. Foglio disability benefits (R. 28).

### III.

We uphold an ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citation omitted). In asking whether the ALJ's decision has adequate support, we will not reweigh the evidence or substitute our judgment for that of the

ALJ's. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citations omitted). A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citation omitted).

Ms. Foglio raises a series of challenges to the ALJ's decision. She contends that the ALJ: (1) improperly "played doctor" in determining her mental and physical RFC (Pl.'s Mem. at 8-11); (2) wrongly assessed the opinions of her treating physicians (*Id.* at 11-14); (3) failed to consider the combined effects of her impairments in determining her RFC (*Id.* at 14-17); and (4) improperly assessed her credibility (*Id.* at 17-20).

<h2 style="text-align:center">A.</h2>

The ALJ assigned Ms. Foglio an RFC that limited her to light work that does not involve concentrated exposure to extreme heat, extreme cold, humidity, heights, or hazards; allows her to alternate between sitting and standing every thirty minutes for five minutes at a time; and involves only simple instructions and routine tasks. This RFC incorporated elements from Ms. Foglio's treating physicians, the state agency physicians, and Ms. Foglio's testimony and functional reports, but it did not entirely adopt the functional limitations set forth by any one of these sources.

As we have recently explained, it is the responsibility of the ALJ (and not physicians) to determine a claimant's RFC, and "'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.'" *Jones v. Colvin*, No. 11 C 1608, 2014 WL 185087, at *13 (N.D. Ill. Jan. 13, 2014) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). Rather, the ALJ must consider all of the relevant medical and nonmedical evidence, so that the claimant's RFC is based on substantial evidence in

the record rather than the ALJ's lay opinion. 20 C.F.R. §§ 404.1545(a)(3); 404.1545(e), 404.1529(c). If conflicting medical evidence is present, the ALJ must create an RFC that "properly consider[s] the entire record and resolve[s] conflicting evidence in a reasonable manner." *Murphy v. Astrue*, 454 Fed. App'x 514, 518 (7th Cir. 2012).

### 1.

The ALJ found that Ms. Foglio's mental impairments were not severe, but that they warranted a limitation in her RFC to work involving only simple instructions and routine tasks. Ms. Foglio argues that in making this determination, the ALJ "rejected" the RFC opinion of Dr. Kuester, and, in rejecting the only medical opinion on Ms. Foglio's mental RFC without ordering an additional psychiatric examination for plaintiff, the ALJ based the mental RFC determination on her lay opinion rather than on record evidence (Pl.'s Mem. at 8-9).

That argument misconstrues the ALJ's treatment of Dr. Kuester's opinion. While the ALJ disagreed with Dr. Kuester's finding that Ms. Foglio had moderate difficulties in maintaining concentration, persistence, and pace, the ALJ agreed with Dr. Kuester's finding that Ms. Foglio's allegations as to the severity of her mental impairments was not supported by her history of minimal treatment and mild mental limitations (R. 24). Moreover, plaintiff disregards the fact that Dr. Kuester did not find that Ms. Foglio had limitations that would render her incapable of all work. Rather, she opined that Ms. Foglio should be limited to work involving simple instructions and routine tasks. And, the ALJ incorporated those limitations in the RFC.

In determining the weight to give Dr. Kuester's opinion, the ALJ properly considered the mental status examination by Dr. Baukus (the only other mental health professional to provide evidence), Dr. Pethkar's notes, and Ms. Foglio's ADLs, functional reports, and testimony. The ALJ found that Dr. Baukus's examination of Ms. Foglio, showing that she did not have difficulty

with serial sevens testing or basic calculations and she had intact memory and adequate abstract thinking, weighed against Dr. Kuester's finding that Ms. Foglio had moderate limitations in concentration, persistence, and pace (R. 20). Ms. Foglio contends that the ALJ "cherry-picked" Dr. Baukus's examination by failing to mention that while Ms. Foglio was able to repeat seven digits forward and five digits backward, she could not repeat eight digits forward or six digits backward (Pl.'s Mem. at 9). Plaintiff does not show why the inability to perform part of this one test would show a moderate level of limitation, in light of the results of all seven tests Dr. Baukus performed to determine Ms. Foglio's mental capacity. This does not constitute the impermissible "cherry-picking" that the Seventh Circuit has warned against. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ also reasoned that Ms. Foglio testified clearly and coherently at the hearing, and she filled out two separate function reports in a detailed and responsive manner (R. 19). Ms. Foglio contends that her ability to testify coherently and complete function reports was not probative of her mental RFC because people with mental disorders have better and worse days (Pl.'s Mem. at 10). Ms. Foglio, however, did not present evidence that on her "worse" days, she would not be able to testify as coherently or complete function reports. The ALJ properly considered Ms. Foglio's ability to participate during her hearing and the function reports as evidence against a severe mental impairment. *See McGuire v. Colvin*, No. 12 C 1413, 2013 WL 4782156, at *10 (N.D. Ill. Sep. 4, 2013); *see also Bates*, 736 F.3d at 1098 (holding that the ALJ sufficiently supported her credibility finding with her observations of the claimant during the hearing and her evaluation of the claimant's testimony at the hearing).

Thus, the ALJ's determination as to Ms. Foglio's mental RFC -- including that she had only minimal limitations in maintaining concentration, persistence, or pace -- was supported by

substantial evidence because the ALJ reviewed Ms. Foglio's medical records, physicians' opinions, testimony, and the other record evidence, and reasonably weighed the evidence both for and against greater RFC limitations.[5] *See Seamon v. Astrue,* 364 Fed. App'x 243, 248 (7th Cir. 2010); *see also Schmidt,* 496 F.3d at 845. In disagreeing with part of Dr. Kuester's opinion, the ALJ was not left with an evidentiary deficit that required her to obtain an additional psychiatric opinion or examination before opining on Ms. Foglio's mental RFC. Rather, the ALJ reasonably concluded, in light of all the relevant evidence, that Ms. Foglio's mental impairments created only mild limitations in her functioning.[6]

## 2.

As for her physical limitations, the ALJ found that Ms. Foglio has an RFC that allows her to perform a reduced range of light work, which does not involve concentrated exposure to extreme heat, extreme cold, humidity, heights, or hazards, and allows her to alternate between sitting and standing every thirty minutes for five minutes at a time (R. 21). Ms. Foglio contends that in determining these limitations, the ALJ substituted her lay opinion for that of medical professionals, because she did not adopt entirely either the opinions of Ms. Foglio's treating physicians, Drs. Siegel and Pethkar, or those of the state agency physicians Drs. Bilinsky, Andrews, and Slodki (Pl.'s Mem. at 14-15; Pl.'s Reply at 7). We disagree.

In determining a claimant's RFC, the ALJ is not required to rely entirely on a particular physician's opinion. *Jones,* 2014 WL 185087, at *13; *Schmidt,* 496 F.3d at 845. The RFC is a

---

[5] Because we conclude that the ALJ's determination that Ms. Foglio had mild limitations in maintaining concentration, persistence, and pace was supported by substantial evidence, this moots Ms. Foglio's argument that the limitation in the RFC to simple instructions and routine tasks does not adequately account for moderate limitations in maintaining concentration, persistence, and pace (*see* Pl.'s Reply at 2; Pl.'s Mem. at 16).

[6] Ms. Foglio also argues that the ALJ erred by rejecting mental limitations that resulted from fibromyalgia (Pl.'s Mem. at 11). We agree that the source of a claimant's limitations is less probative than the limitations themselves in determining the RFC. However, as explained above (*see* pp. 11-12, *infra*), the ALJ completed the paragraph B analysis as to Ms. Foglio's mental functional limitations and supported her decision that Ms. Foglio's mental impairment was not severe with substantial evidence.

legal decision for the ALJ to make after considering all of the relevant medical and nonmedical evidence. 20 C.F.R. § 404.1545; *Newell v. Astrue*, 869 F. Supp. 2d 875, 891 (N.D. Ill. 2012). If conflicting medical evidence is present, the ALJ must create an RFC that resolves the conflicting evidence in a reasonable manner, *Murphy*, 454 Fed. App'x at 518, and the ALJ must include a "narrative discussion" describing how the evidence supports the RFC determination, SSR 96–8p.

In this case, Drs. Pethkar and Siegel opined that Ms. Foglio was too disabled to work due to severe fibromyalgia and a seizure disorder, while Drs. Andrews and Slodki opined that the evidence supported an RFC for the full range of medium work and Dr. Bilinsky, in an earlier opinion, found that Ms. Foglio had no severe physical impairments. To resolve this conflict, the ALJ looked to the physical examination results behind these medical opinions, Ms. Foglio's testimony, her activities of daily living, and her work history.

The ALJ gave Dr. Andrews' and Dr. Slodki's opinions "some weight" because she reasoned that Ms. Foglio's testimony as to her pain supported additional limitations in her RFC. Although, as plaintiff points out, the ALJ did not credit her testimony entirely (Pl.'s Mem. at 15) – as the testimony would preclude her from performing any work – the ALJ's limitation to light work with a sit/stand option incorporated the extent of plaintiff's complaints that the ALJ (as we explain below) reasonably found credible. The ALJ gave little weight to Dr. Siegel's opinion, and did not give Dr. Pethkar's opinions "controlling or great weight," because the ALJ determined that these opinions were not well-supported and were inconsistent with the other record evidence, Ms. Foglio's work history, and the doctor's own examination results. As in *Jones*, 2014 WL 185087, at *11, the ALJ explained that the examination results were predominantly normal and thus inconsistent with severe functional limitations. *See also Filus v. Astrue*, 694 F.3d 863, 868-69 (7th Cir. 2012).

Plaintiff contends that the ALJ's decision not to accord controlling weight to the opinions of Drs. Siegel and Pethkar cannot stand because they were entitled to deference under the "treating physician rule" (Pl.'s Mem. at 11-13). The opinion of the claimant's treating physician, however, is not sacrosanct. "[O]nce well supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider." *Bates*, 736 F.3d at 1099.

To begin with, a physician's opinion that a claimant is "disabled" is entitled to no weight, as the question of disability is a legal one reserved to the Commissioner. *See, e.g., Sawyer v. Colvin*, 512 Fed. App'x 603, 609 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(d)(1)). Insofar as Drs. Pethkar and Siegel expressed opinions concerning Ms. Foglio's limitations, the ALJ provided good reasons for giving those opinions diminished weight.

As to Dr. Siegel, the ALJ did not err in giving "little weight" to her opinion that Ms. Foglio could not work due to fibromyalgia and seizure disorder, because Dr. Siegel's opinion was not "well-supported," and she was not Ms. Foglio's treating physician at the time Ms. Foglio claims she became disabled. The record contains only one document from Dr. Siegel, a letter dated June 2, 2009. Though the letter is dated after Ms. Foglio's alleged onset date of March 30, 2009, Dr. Siegel only saw Ms. Foglio once in the prior year and a half – with the last time being July 2, 2008, eight months before the onset date. The ALJ recognized that Dr. Siegel was a rheumatologist, but found that Dr. Siegel had "no basis" for her opinion because she had last examined Ms. Foglio long before the alleged onset date, and Ms. Foglio's substantial gainful work activity continued long after the date Dr. Siegel last examined her (R. 25). These were adequate reasons for discounting Dr. Siegel's opinion. *See Filus*, 694 F.3d at 868 (ALJ was

entitled to rely on infrequency of treatment and lack of clinical tests to discount physician's opinion).[7]

Likewise, the ALJ adequately explained her reasons for not giving Dr. Pethkar's opinion controlling weight. Although Dr. Pethkar was Ms. Foglio's treating physician, the ALJ reasonably found that his opinion that Ms. Foglio was disabled due to seizures -- offered the first time Dr. Pethkar met Ms. Foglio in April 2009, and thus without the benefit of any longitudinal view of her condition -- was "absurd" because Ms. Foglio had only had one seizure, due to excessive medication intake, and she was never placed on anti-epileptic drugs or monitored for seizures. The ALJ reasoned that this opinion was "so unsupported that it further calls into question his opinion that the claimant should not work due to her fibromyalgia" (R. 24). In addition, the ALJ reviewed Dr. Pethkar's medical notes and found them inconsistent with his opinion that Ms. Foglio was disabled due to severe fibromyalgia. The ALJ explained that Dr. Pethkar documented mostly normal physical findings except for decreased sensation in her legs to touch and pinprick, and at one examination, multiple tender points (R. 23-24). The ALJ may properly discount a treating physician's opinion that is internally inconsistent or inconsistent with the other substantial evidence in the record. *See also Hall ex rel. Hall v. Astrue*, 489 Fed. App'x 956, 958 (7th Cir. 2012). Thus, the ALJ's decision to discount Dr. Pethkar's opinion was supported by substantial evidence.[8]

---

[7] Plaintiff argues that the ALJ's treatment of Dr. Siegel was inconsistent with her decision to assign some weight to Drs. Slodki and Andrews, who never treated plaintiff and were not specialists (Pl. Mem. at 14). We disagree. While Drs. Slodki and Andrews did not treat plaintiff, their opinions were based on evidence from the relevant time frame, while the ALJ found that Dr. Siegel's opinion was based on evidence that preceded the relevant time frame.

[8] The ALJ also found that Ms. Foglio's work activity undermined Dr. Pethkar's opinion that Ms. Foglio's fibromyalgia was disabling because she had been diagnosed with fibromyalgia since 2003 but had maintained substantial gainful activity until her seizure in March 2009.

In light of the above evidence, the ALJ reasoned that Ms. Foglio was not disabled, but because of her fibromyalgia and other impairments, should be limited to light work with a sit/stand option and other environmental restrictions. We find that the ALJ resolved the conflicts between the doctors' opinions in the record "in a reasonable manner." *Murphy*, 454 Fed. App'x at 518. As in *Jones*, 2014 WL 185087, at *11, the ALJ conducted "a thorough review" of medical records and "a reasonable weighing of the evidence both for and against greater RFC limitations." *Id.* (citing *Seamon*, 364 Fed. App'x at 248; *Schmidt*, 496 F.3d at 845). As in *Seamon* and *Schmidt*, the ALJ here did not err in formulating an RFC that was not expressed by a doctor's opinion in the record. *See also Metzger v. Astrue*, 263 Fed. App'x 529, 532-33 (7th Cir. 2008) (holding that the ALJ did not "play doctor" by not adopting physicians' opinions of the claimant's RFC, where the ALJ explained her reasons for rejecting the doctors' conclusions, which at times conflicted with the claimant's own statements and other physicians' opinions); *cf. Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006) (remanding case where ALJ "played doctor" by creating an RFC with no support in the record); *Koppers v. Colvin*, No. 12 C 3993, 2013 WL 4552505, at *12-13 (N.D. Ill. Aug. 28, 2013) (remanding case where ALJ failed to specify what evidence supported limitations in RFC after rejecting RFC opinions of physicians in the record). We find that the ALJ's RFC formulation was supported by substantial evidence.

## B.

Next, plaintiff argues that the ALJ failed to consider the combined effects of all her impairments in determining her RFC. Ms. Foglio provides a laundry list of impairments that she argues should have been explicitly considered in combination by the ALJ: fibromyalgia, chronic

fatigue syndrome, depression, anxiety, chronic pain syndrome, myoclonus, obesity, and somatoform disorder (Pl.'s Reply at 7; Pl.'s Mem. at 15-16).

It is well-settled that "an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). We have already explained above how the ALJ incorporated the limitations caused by Ms. Foglio's fibromyalgia pain. The ALJ limited the RFC to light work with a sit/stand option and no exposure to extreme heat, cold or humidity, to avoid aggravating Ms. Foglio's fibromyalgia pain. In addition, as explained above, the ALJ limited Ms. Foglio's RFC to simple instructions and routine tasks to account for the minimal paragraph B mental limitations that the ALJ found supported by the evidence. The ALJ specifically considered Ms. Foglio's chronic pain syndrome (somatoform disorder)[9] and anxiety, but found them not severe. She did not mention Ms. Foglio's alleged depression, but this was not error, as Ms. Foglio provided scant evidence or argument that she suffers from depression, which was only sporadically mentioned in Dr. Pethkar's notes. The ALJ also explained how she accounted for Ms. Foglio's chronic fatigue in the RFC. As reviewed above, she gave Ms. Foglio "the benefit of the doubt in regards to her allegations of dizziness and fatigue," and so limited her to work that does not involve concentrated exposure to dangerous machinery or heights, and work that involves only simple instructions and routine tasks.

Furthermore, the ALJ stated that the limitation to light work with a sit/stand option also accommodated for any additional functional limitations caused by Ms. Foglio's obesity (R. 20). This explanation was adequate where, as here, the claimant did not articulate how obesity exacerbated her underlying conditions and limited her functioning. *See Jones*, 2014 WL 185087,

---

[9]Somatoform disorder and chronic pain syndrome both refer to chronic pain with a psychological, rather than physical, cause. http://www.nlm.nih.gov/medlineplus/ency/article/000922.htm.

at *13 (citing *Hernandez v. Astrue*, 277 Fed. App'x 617, 624 (7th Cir. 2008); *Mueller v. Colvin*, 524 Fed. App'x 282, 286 (7th Cir. 2013)). While Dr. Pethkar occasionally noted Ms. Foglio was concerned that she had gained weight, neither she nor her doctors discussed any additional functional limitations caused by her obesity.

Moreover, while there is evidence in the record that Ms. Foglio suffered from myoclonus, the ALJ was skeptical that Ms. Foglio suffered severe functional limitations from what she described as involuntary "jerking like muscle spasms." The ALJ explained that the only consistently documented abnormal physical findings in Dr. Pethkar's treatment notes were decreased sensation in Ms. Foglio's legs. The ALJ reasoned that if Ms. Foglio had significant problems with muscle spasms, these problems would have been mentioned in Dr. Pethkar's treatment notes (R. 23-24).[10]

## C.

Lastly, plaintiff argues that the ALJ improperly found her allegations of pain, numbness, muscles spasms, and side effects less than credible (Pl.'s Br. at 18-20). It is well-settled that the ALJ's credibility decision is entitled to deference, and we will not overturn it unless it is "patently wrong." *Bates*, 736 F.3d at 1098. "[W]e will uphold the credibility finding if the ALJ offers specific reasons to disbelieve the claimant's testimony." *Lott v. Colvin*, No. 13 C1180, 2013 WL 5630633, at *4 (7th Cir. Oct. 16, 2013).

Here, the ALJ offered adequate reasons for disbelieving Ms. Foglio's testimony, while nevertheless giving her the benefit of the doubt in some instances. For example, the ALJ recognized that Ms. Foglio testified to certain minor side effects from her medication, such as

---

[10]Though the ALJ stated that Dr. Pethkar's notes did not mention that Ms. Foglio suffered from these involuntary spasms, Dr. Pethkar's notes occasionally listed "motor disturbances" as one of Ms. Foglio's symptoms (*see, e.g.,* R. 414). Dr. Pethkar, however, never recorded any functional limitations resulting from these motor disturbances, and thus, the ALJ did not err in determining that Ms. Foglio's testimony as to the severe limitations her myoclonus causes was not credible.

sleepiness, dry mouth, and difficulty concentrating, but the ALJ discounted this testimony because she did not complain of side effects to Dr. Pethkar. In addition, while the ALJ did not find Ms. Foglio's testimony as to the severity of her pain, numbness, and muscle spasms completely credible in light of her work activity, ADLs, and Dr. Pethkar's predominantly normal examination results, the ALJ gave her the benefit of the doubt, and included multiple limitations in the RFC to account for the pain.

Ms. Foglio also contends that the ALJ erred in considering her application for unemployment benefits -- in which she held herself out as being able to work -- in support of an adverse credibility finding (Pl.'s Mem. at 19, citing R. 26). Contrary to plaintiff's contention, however, "ALJs may rely on this ability-to-work certification as one of many factors adversely impacting the claimant's credibility." *Lott*, 2013 WL 5630633, at *4 (internal quotations omitted). Likewise, although Ms. Foglio's part-time work between March and September does not preclude her from establishing that she was disabled during this time, *see Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013), the ALJ is not precluded from considering how this also affects Ms. Foglio's credibility.

In light of these proper reasons that the ALJ provided for discounting Ms. Foglio's credibility, we find that the ALJ's credibility decision was not patently wrong.

## CONCLUSION

For the reasons stated above, we deny Ms. Foglio's motion to reverse and remand the ALJ's decision (doc. # 21), and affirm the Commissioner's decision.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: February 19, 2014**